UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------X
DAVID NEKTALOV, et al.,                                       MEMORANDUM
                                    Plaintiffs,               AND ORDER
            - against -
KUWAIT AIRWAYS CORPORATION,                                   15-CV-0033 (JO)
                                    Defendant.
--------------------------------------------------------X

James Orenstein, Magistrate Judge:

Plaintiffs David and Iris Eliazarov Nektalov have asserted a variety of discrimination and tort claims against defendant Kuwait Airways Corporation ("KAC") for refusing to honor Iris Nektalov's ticket for passage on a flight from John F. Kennedy International Airport ("JFK") to London because she held an Israeli passport. *See* Docket Entry ("DE") 11 (Amended Complaint) ("Complaint"). Each side has moved for dispositive relief: the Nektalovs seek partial summary judgment on the question of liability, *see* DE 36, Fed. R. Civ. P. 56; and KAC seeks the dismissal of all of the plaintiffs' causes of action (save for a discrimination claim under state and municipal law) for failure to state a claim, *see* DE 30, Fed. R. Civ. P. 12(b)(6). For the reasons set forth below, I deny the plaintiffs' motion for partial summary judgment; I dismiss without prejudice their claim under Title 42, United States Code, Section 1981; and I dismiss with prejudice all of their remaining claims except their cause of action for discrimination under state and municipal law.

I.    Background

Iris Nektalov is a United States permanent resident who was born in Israel and has an Israeli passport. DE 40 (Nektalovs' Rule 56.1 statement) ("N56") ¶¶ 3-5; DE 46 (KAC's Rule 56.1 statement) ("K56") ¶ 1; DE 3-1 (David Nektalov Aff.) ¶ 3. Her husband David is a United States citizen. N56 ¶ 1; David Nektalov Aff. ¶ 2. On October 30, 2014, the Nektalovs purchased round-trip airline tickets from KAC for travel between JFK and Heathrow Airport in London, England. N56 ¶ 7; David Nektalov Aff. ¶ 5. On November 1, 2014, when the Nektalovs arrived at

the JFK boarding gate for their flight to London, KAC permitted David Nektalov to board the airplane but refused entry to Iris Nektalov "because she has an Israeli passport[.]" N56 ¶¶ 11-13; David Nektalov Aff. ¶ 7; DE 32 (KAC memorandum supporting dismissal motion) ("KM") at 1; Complaint ¶¶ 15-16. As a result of KAC's refusal to board her, Iris Nektalov had to buy a ticket to London from another airline. DE 3-1 (David Nektalov Aff.) ¶ 7; DE 3-2 (Iris Nektalov Aff.) ¶ 3.

KAC explained its actions by noting that the law of Kuwait, to which it is subject, prohibits the airline from conducting business with Israeli citizens. *See* DE 37 (Nektalov memorandum supporting summary judgment motion) ("NM") at 2 (citing Kuwaiti Law No. 21 of 1964 Concerning the Unified Law for the Boycott of Israel). On December 3, 2014, KAC refunded $2,478.96 to the Nektalovs, an amount that not only wholly reimbursed them for the price of Iris Nektalov's ticket, but also constituted a full refund for the tickets purchased for David Nektalov and an additional family member with whom they were travelling. K56 ¶ 13.

The next day, on December 4, 2014, the Nektalovs filed their initial complaint in New York Supreme Court, Queens County. DE 1 at 6-10. KAC then timely removed the case to this court on January 6, 2015. DE 1 at 1-3 (removal notice).[1]  Following the removal, the Nektalovs filed their amended complaint (the operative pleading for the instant motions) on February 26, 2015. DE 11. The amended pleading asserted the following nine causes of action:

- unlawful discrimination in violation of Title 42, United States Code, Section 1981 ("Section 1981"), *id.* ¶¶ 20-27;

- unlawful discrimination by a beneficiary of United States government aid, in violation of Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d ("Title VI"), *id.* ¶¶ 28-31;

---

[1]  KAC asserted that the removal was timely because it occurred less than 30 days after the Nektalovs served process on it, on December 24, 2014. It further asserted that this court has original jurisdiction over the action because KAC, a Kuwaiti corporation that is wholly owned by the government of Kuwait, is a foreign state for purposes of applicable law. DE 1 at 1-2 (citing 28 U.S.C. §§ 1330(a), 1603(a)).

- intentional infliction of emotional distress ("IIED") in violation of New York law, *id.* ¶¶ 32-39;

- negligent infliction of emotional distress ("NIED") in violation of New York law, *id.* ¶¶ 40-44;

- negligence in violation of New York law, *id.* ¶¶ 45-54;

- failure to train, supervise and discipline KAC employees, in violation of New York law, *id.* ¶¶ 55-61;

- unlawful discrimination in violation of New York state and municipal law, *id.* ¶¶ 62-68 (citing New York State Human Rights Law, N.Y. Exec. Law. §§ 296-97 ("NYSHRL"); New York City Human Rights Law, N.Y.C. Admin. Code, §§ 8–107(4), (18) & 8-130 ("NYCHRL"));[2]

- unlawful discrimination in violation of the United Nations Charter, *id.* ¶¶ 69-73 (citing U.N. Charter art. 1, para. 3); and

- violation of federal anti-boycott provisions of the Export Administration Regulations, 15 C.F.R. § 760.2(a)(1), *id.* ¶¶ 74-79.

On July 30, 2015, the parties consented to refer the case to a magistrate judge for all purposes, including the entry of judgment, and the case was thereafter reassigned to me. DE 22; DE 23; 28 U.S.C. § 636(c). The parties filed KAC's fully briefed motion to dismiss on December 3, 2015; they filed the Nektalovs' fully briefed motion for summary judgment on December 4, 2015. DE 30; DE 36. I heard oral argument on both motions on January 14, 2016 and reserved decision. DE 51 (minute entry); DE 53 (transcript) ("Tr.").

II.   The Plaintiffs' Motion for Summary Judgment

"[S]ummary judgment is proper 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (quoting Fed. R. Civ. P. 56(c)). In determining whether to grant

---

[2]  KAC does not now seek dismissal of this claim. Although I dismiss all other claims in the complaint, this court retains jurisdiction over the action because KAC is a foreign state. *See* 28 U.S.C. §§ 1330(a). 1441(d), 1603(a).

summary judgment, a court is confined to issue-finding, not issue-resolution. *Rasmussen v. Sigma Corp. of Am.*, 27 F. Supp. 2d 388, 391 (E.D.N.Y. 1998) (citing *B.F. Goodrich v. Betkoski*, 99 F.3d 505, 522 (2d Cir. 1996)). The court does not "weigh the evidence and resolve … factual issues" but rather "determine[s] as a threshold matter whether there are genuine unresolved issues of material fact to be tried." *Owens v. New York City Hous. Auth.*, 934 F.2d 405, 408 (2d Cir. 1991) (quoting *Gibson v. Am. Broad. Cos.*, 892 F.2d 1128, 1132 (2d Cir. 1989)); *see also* Fed. R. Civ. P. 56(c). A fact is material if it "might affect the outcome of the suit under the governing law." *Holtz v. Rockefeller & Co., Inc.*, 258 F.3d 62, 69 (2d Cir. 2001) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). A genuine issue is presented if "the evidence is such that a reasonable jury could return a verdict for the non[-]moving party." *Id.* (same). On a motion for summary judgment, "[t]he evidence of the non-movant is to be believed … [and] all permissible inferences are to be drawn in [her] favor[.]" *Redd v. New York Div. of Parole*, 678 F.3d 166, 174 (2d Cir. 2012) (internal citations and quotation marks omitted).

"[T]he party moving for summary judgment has the burden to show that he is entitled to judgment under established principles; and if he does not discharge that burden then he is not entitled to judgment. No defense to an insufficient showing is required." *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 161 (1970) (citing 6 James Moore, *Federal Practice* § 56.22(2) 2824-2825 (2d ed. 1966)) (internal quotation marks omitted).

The essential facts of this case are not in dispute: KAC acknowledges that it denied passage to Iris Nektalov "because she was traveling under an Israeli passport." KM at 1 (citing Complaint ¶¶ 1, 14, 16). The question thus reduces to whether that admission entitles the Nektalovs to prevail on their claims. As explained below, it does not.

As a threshold matter, at no point do the Nektalovs offer any analysis of the specific causes of action they assert against KAC or make any attempt to demonstrate that the undisputed facts of the case satisfy the essential elements of any such claim. Instead, they simply offer the conclusory assertion that KAC has violated the law applicable to each claim. That alone suffices to deny their motion for summary judgment. Moreover, none of the specific legal (or, in some instances, policy-based) arguments they do offer suffices to warrant any relief as a matter of law.

The Nektalovs first contend that federal judicial decisions in cases arising out of the Nazi government's treatment of Jews during the Holocaust set a precedent that compels a judgment in their favor for having had to make alternate travel arrangements. Specifically, they argue that in those cases, "Federal Courts held that a diplomatic solution must be accomplished by the Federal Executive Branch when a foreign entity deliberately seeks to break our … [l]aws here in New York" and that, in the absence of such a diplomatic solution, "the Federal Judiciary must act." NM at 4, 6 (citing *In re Nazi Era Cases against German Defendants Litig.* ("*Nazi Era Cases*"), 198 F.R.D. 429 (D.N.J. 2000); *Nazi Era Cases*, 213 F. Supp. 2d 439 (D.N.J. 2002); *Nazi Era Cases*, 236 F.R.D. 231 (D.N.J. 2006); *Nazi Era Cases*, 240 F. App'x 980 (3d Cir. July 20, 2007), *cert. denied*, 552 U.S. 1098 (2008)). The *Nazi Era Cases* concerned efforts to remediate a German bank's misappropriation, as an agent of the Nazi government, of a Jewish family's fortune. Analogizing the instant case to that litigation, the Nektalovs assert that the *Nazi Era Cases* compel the following relief:

> In the instant case, this Court must direct the United States Department of Justice Representative to have our Federal Executive Branch send a Special Envoy to Kuwait to inform the Government of Kuwait that they cannot enforce Kuwait Law No. 21 of 1964 (concerning the Unified Law for the Boycott of Israel) at Kennedy Airport in Queens County, New York, any longer. The U.S. Special Envoy must inform Kuwait that the U.S. Government will withdraw any further assistance to Kuwait if this is not done.
>
> This Court must make it clear to the United States Department of Justice representative and KAC that in the absence of a diplomatic solution, this Court must

> grant partial Summary Judgment to the plaintiffs, and order discovery and a Jury
> Trial so that plaintiffs can receive justice in this matter. KAC must be taught that
> they cannot trample upon the rights of United States Permanent Residents with
> Israeli passports or any other passports.

*Id.* at 7. The argument is unavailing as a matter of fact and law. KAC's conceded discrimination

against an Israeli passport holder, however objectionable, simply does not approach the type or

magnitude of harm that the Nazis inflicted on their victims. Moreover, the conduct of foreign policy

is committed to the executive branch; this court does not have the authority to dictate to that branch

how it must conduct itself in that regard.

The Nektalovs next contend that they are entitled to summary judgment because KAC's

conduct violates the "American National Creed," which they assert is not only "engraved on the

Statue of Liberty," but, more pertinently, is "set forth in our City, State and Federal laws" – albeit in

provisions they fail to identify *Id.* at 10. I have no doubt that as a matter of policy, KAC's adherence

to the boycott of Israel codified in Kuwaiti law is in tension with the principle of equality that

undergirds a wide swath of American laws. Nevertheless, the Nektalovs' citation to an otherwise

undefined "American National Creed" is not in itself a sufficient basis for granting partial summary

judgment on any of their claims.[3]

---

[3]  The Statue of Liberty Enlightening the World bears several inscriptions, including, most
prominently, the legend "JULY IV MDCCLXXVI" on the tablet in the standing figure's hand, as
well as the text of Emma Lazarus's sonnet, "The New Colossus." As far as I can determine, none of
its inscriptions purport to recite the "American National Creed." In any event, whether or not those
words appear somewhere on the monument is immaterial to the instant analysis. A search of the
Westlaw databases of all federal and state laws and cases does not reveal a single statute or decision
that mentions an "American National Creed." In 1918, the House of Representatives reportedly
"adopted" William Tyler Page's "An American's Creed," which reads as follows:

> I believe in the United States of America as a Government of the people, by the
> people, for the people; whose just powers are derived from the consent of the
> governed; a democracy in a republic, a sovereign Nation of many sovereign States; a
> perfect Union one and inseparable; established upon those principles of freedom,
> equality, justice and humanity for which American patriots sacrificed their lives and

The Nektalovs argue next that partial summary judgment is appropriate because KAC's actions violate the prohibition against "extraterritorial enforcement of foreign penal laws" in the United States. *Id.* at 11. This argument fails for at least two reasons. First, KAC has not sought to enforce Kuwaiti penal law; instead, it contends no more than that it chose a course of conduct that it believed to be consistent with the dictates of the laws of both Kuwait and the United States. Second, and more fundamentally, the Nektalovs do not explain why, even if KAC did somehow enforce Kuwaiti penal law, that in itself would satisfy the essential elements of any of their causes of action (several of which are not asserted under the law of the United States).

The Nektalovs' fourth argument is one of policy rather than law: "Kuwait, Israel and the United States share a common historical bond which must be honored." *Id.* at 12. That is an opinion; however compelling it may be, it is not a basis for a judicial remedy.

Finally, the Nektalovs rely on a federal administrative decision that KAC "unreasonably discriminated against [an Israeli citizen] in violation of 49 U.S.C. § 41310 by refusing to sell him a ticket[.]" DE 38 (Nektalov Affidavit supporting summary judgment motion), ¶ 6 & Ex. 1 (*Eldad Gatt v. Anthony Foxx*, No. 14-1040 (D.C. Cir.), Decision Letter from Office of the Sec'y of Transp. (Dep't of Transp. Sept. 30, 2015)) at 1; *see* DE 42 (Nektalov Reply Affidavit); DE 43 (Nektalov Reply) ("NR") at 6-7. That reliance is misplaced because although the statute the Nektalovs cite empowers the Secretary of Transportation to impose sanctions on an airline that unlawfully discriminates against passengers, it does not confer on the passengers themselves a private right of action to enforce its anti-discrimination rules in federal court. *See Fields v. BWIA Int'l Airways Ltd.*, 2000 WL

---

fortunes. I therefore believe it is my duty to my country to love it, to support its Constitution, to obey its laws, to respect its flag, and to defend it against all enemies.

138 Cong. Rec. S5346-03, S5346, 1992 WL 72285 (Apr. 9, 1992) (statement of Sen. McCain). That "Creed" – even assuming it to be the doctrine the Nektalovs intend to cite – has no legal force, and in any event does not compel a decision in the Nektalovs' favor.

1091129, at *4, n.5 (E.D.N.Y. July 7, 2000) (no private right of action under 49 U.S.C. § 41310); *Elnajjar v. Nw. Airlines, Inc.*, 2005 WL 1949545, at *6 (S.D. Tex. Aug. 15, 2005) (same); *see also Montauk-Caribbean Airways, Inc. v. Hope*, 784 F.2d 91, 98 (2d Cir. 1986) (no private right of action generally under the Federal Aviation Act). Thus, however just the Secretary's decision may have been in *Gatt*, it does not serve as a basis to find that KAC is liable to the Nektalovs on any of their claims. I therefore deny the motion for partial summary judgment.[4]

III.   The Defendant's Motion to Dismiss

KAC seeks the dismissal of all of the Nektalovs' causes of action (aside from Count 7) for failure to state a claim. *See* Fed. R. Civ. P. 12(b)(6). In considering that motion, I must consider the "legal sufficiency of the complaint, taking its factual allegations to be true and drawing all reasonable inferences in the plaintiff[s'] favor." *Harris v. Mills*, 572 F.3d 66, 71 (2d Cir. 2009) (citations omitted). To survive a motion to dismiss, the assertions in the complaint must suffice to "state a claim to relief that is plausible on its face[,]" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007), meaning that the facts alleged "allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 663 (2009). "Determining whether a complaint states a plausible claim for relief will … be a context-specific task that requires the reviewing court

---

[4]   The foregoing analysis obviates the need to address KAC's argument that, because it denied Iris Nektalov passage while she was in the process of embarking on its airplane, the Montreal Convention is the sole source of law for resolving the claims in this case – and that any claims asserted under other laws are preempted. *See* DE 44 (KAC memorandum opposing summary judgment motion) ("KO") at 1, 4-6 (citing Convention for the Unification of Certain Rules for International Carriage by Air, concluded at Montreal, Canada on May 28, 1999, *reprinted in* S. Treaty Doc. No. 106-45, 1999 WL 33292734; *King v. Am. Airlines, Inc.*, 284 F.3d 352, 359 (2d Cir. 2002)). In any event, the factual assertion on which the argument is premised is in dispute, *see* Tr. at 4-13, and therefore not amenable to resolution at this stage. Analysis of the treaty's applicability is likewise unnecessary to a resolution of the motion to dismiss: KAC does not seek dismissal of any claim on the basis of the Montreal Convention, and cites the latter only in referring to the discrimination claims under state and municipal law that it does not now challenge. *See* DE 34 (KAC Reply) ("KR") at 1 n.1 (asserting that NYSHRL and NYCHRL claims "appear to be preempted by the Montreal Convention").

to draw on its judicial experience and common sense." *Id.* at 679. "But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged – but it has not 'show[n]' – 'that the pleader is entitled to relief.'" *Id.* (alterations in original) (quoting Fed. R. Civ. P. 8(a)(2)).

When assessing the sufficiency of a complaint, the court must distinguish factual contentions, which allege behavior on the part of the defendant that, if true, would satisfy one or more elements of the claim asserted, from "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements[.]" *Id.* at 678. Although, for the purposes of a motion to dismiss, the court must assume the veracity of the facts asserted in the complaint, it is "not bound to accept as true a legal conclusion couched as a factual allegation." *Id.* (internal citations omitted). I apply that standard to each claim in turn below.

A.    Count 1: Section 1981

KAC argues that the Nektalovs' claim under Section 1981 must be dismissed because the Nektalovs allege discrimination solely on the basis of national origin, which the statute does not proscribe. *See* KM at 2-4. I agree.

> It is established that Section 1981 prohibits discrimination based on race in the making and enforcement of contracts, and extends to private as well as state actors in that regard. The prohibition against racial discrimination encompasses discrimination based on ancestry or ethnic characteristics. It is also settled that Section 1981 does not prohibit discrimination on the basis of ... religion ... [or] national origin[.]

*Anderson v. Conboy*, 156 F.3d 167, 170 (2d Cir. 1998) (internal citations omitted). While Section 1981 does prohibit discrimination on the basis of alienage – that is, discrimination based on the fact that a person is not a citizen of the United States – it does not outlaw discrimination based on a person's particular "birthplace or nation of origin[.]" *Ayiloge v. City of New York*, 2002 WL 1424589, at *16 (S.D.N.Y. June 28, 2002).

9

The Nektalovs broadly allege that KAC discriminated against Iris Nektalov on the basis of her "race, color, creed, religion, alienage, ancestry, and/or national origin and/or citizenship status[.]" Complaint ¶ 24. But that merely asserts a legal conclusion; their non-conclusory factual allegation in support of it is more precise: namely, that KAC's "stated reason" for denying passage to Iris Nektalov was that she "has an Israeli passport." *Id.* ¶ 16. The Nektalovs make no allegation in the Complaint that KAC's decision was in any way predicated on Iris Nektalov's race or alienage.

In opposing the motion, the Nektalovs argue that Section 1981 applies because KAC discriminated against them as members of what they claim to be a cognizable race: the "New York Jewish community." DE 33 (Nektalov memorandum opposing dismissal motion) ("NO") at 4-5 (citing *Mass v. McClenahan*, 893 F. Supp. 225, 230 (S.D.N.Y. 1995) (holding that "the public policy embodied in [Section] 1981 clearly require[d] that plaintiff be provided with a remedy" where there was "direct evidence" that he was discriminated against because he was a "New York Jew")).

This argument has two basic defects. First, whatever else may have motivated KAC to deny passage to Iris Nektalov, the Complaint's own allegations render wholly implausible the proposition that it was her membership in the New York Jewish community as such. The Complaint makes clear that both David and Iris Nektalov are members of that community – and it makes equally clear that only Iris Nektalov was prevented from boarding the flight to London. Thus, the factual allegations already in the Complaint render implausible the allegations the Nektalovs would have me read into their pleading – namely, that KAC discriminated against Iris Nektalov specifically because she is a "New York Jew."

Second, the decision in *Mass* on which the Nektalovs rely simply did not hold that "New York Jew" is a race for purposes of Section 1981. Instead, the court held that discrimination against a "New York Jew" is as pernicious as the racial discrimination the statute forbids, and should therefore have a remedy:

> While the worthwhile goal of protecting a client's right to discharge a lawyer at any time may make it appropriate to impose a higher standard of proof of discriminatory intent when a lawyer brings a claim of discrimination, in the present case there is direct evidence that plaintiff was discharged because he was "a New York Jew." If this is in fact what happened, the public policy embodied in § 1981 clearly requires that plaintiff be provided with a remedy. This country's strong commitment to the proposition that *there should be no discrimination on the basis of race, religion or national origin* need not founder on the fear that somehow the enforcement of this policy will destroy the attorney-client relationship. It is difficult to believe that lawyers will often bring claims of discrimination against their former client. In the rare case where the issue is raised, the courts can be trusted to scrutinize such claims with care and to fashion appropriate relief.

*Mass*, 893 F. Supp. at 230 (emphasis added). I respectfully disagree with such reasoning as a matter of law. The fact that a form of discrimination is pernicious and wholly deserving of condemnation does not, in itself, mean that it should be recognized as the basis for any particular statutory remedy. The court in *Mass* explicitly conflated racial discrimination, which Section 1981 prohibits, with discrimination on the basis of religion or national origin, which that statute does not address. Having done so, the court glossed over the question of whether "New York Jew" is a race for purposes of Section 1981 – and as a result, the Nektalovs' attempt to cite it for that point is futile.

Thus, the Nektalovs' Section 1981 claim, as currently pleaded, is defective and must be dismissed. But because the record makes clear that the Nektalovs contend that KAC's action was predicated on anti-Semitic animus, they must be given an opportunity to amend. The law of this circuit deems Jews to be a racial group for purposes of Section 1981. *See Sherman v. Town of Chester*, 752 F.3d 554, 567 (2d Cir. 2014); *United States v. Nelson*, 277 F.3d 164, 177-78 (2d Cir. 2002); *T.E. v.*

*Pine Bush Cent. Sch. Dist.*, 58 F. Supp. 3d 332, 354 (S.D.N.Y. 2014) (citing *Shaare Tefila Congregation v. Cobb*, 481 U.S. 615, 617-18 (1987)). If the Nektalovs are in a position to plead that KAC knew them to be Jewish (which the record does not currently reveal), and that it discriminated against them on that basis in circumstances giving rise to a claim that the Montreal Convention would not preempt, they may be in a position to assert a viable claim under Section 1981.[5]

      B.    <u>Count 2: Title VI</u>

      KAC argues that the Nektalovs' claim under Title VI is defective both because KAC does not receive "federal financial assistance" within the statute's meaning and because they lack standing to bring such a claim. KM at 4-5. As explained below, I agree.

      Title VI provides that "[n]o person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 42 U.S.C. § 2000d. Thus, to plead their claim under Title VI, the Nektalovs must plausibly allege that KAC receives "federal financial assistance" within the meaning of the statute. *See Bary v. Delta Airlines, Inc.*, 553 F. App'x 51, 52-53 (2d Cir. 2014).

      Determining whether KAC receives federal financial assistance turns "on factors such as (1) whether [it] is Congress's intended recipient, and (2) whether [it] was in a position to accept or reject the funds." *Davis v. City of New York*, 959 F. Supp. 2d 324, 364 (S.D.N.Y. 2013). Under Title VI:

> Congress enters into an arrangement in the nature of a contract with the recipients of the funds: the recipient's acceptance of the funds triggers coverage under the nondiscrimination provision. By limiting coverage to recipients, Congress imposes the obligations of [nondiscrimination] upon those who are in a position to accept or reject those obligations as a part of the decision whether or not to 'receive' federal funds.

---

[5]  In that regard, I note that the Nektalovs' counsel raised the possibility that KAC does not enforce its ban on Israeli passport holders against those who are not Jewish. *See* Tr. at 23-24.

*U.S. Dep't of Transp. v. Paralyzed Veterans of Am.*, 477 U.S. 597, 605-06 (1986) (holding that where the federal government provided funding to airport operators and not to the airlines themselves, the "recipient[s]" of federal funding were the airport operators and not the airlines (citing *Soberal-Perez v. Heckler*, 717 F.2d 36, 41 (2d Cir. 1983), *cert. denied*, 466 U.S. 929 (1984))). Federal funding, therefore, must be of a "contractual nature" to come within the meaning of "federal financial assistance" under Title VI. *See Soberal-Perez*, 717 F.2d at 41.

The Complaint alleges that KAC is a recipient of federal financial assistance because it "is government owned and the Government of Kuwait was the beneficiary of substantial United States Government assistance in its 1991 war with the Government of Iraq[;]" and because "it regularly lands at John F. Kennedy Airport … and said airport receives considerable federal financial assistance." Complaint ¶ 29. In opposing the instant motion, the Nektalovs add that KAC, an entity wholly owned by the Government of Kuwait, exists only because the United States Department of Defense "conducted the Gulf War" in early 1991 and continues to maintain eight military bases in Kuwait to protect and secure that nation. *See* NO at 5. Such allegations and arguments do not suffice.

The military assistance the Nektalovs cite is too far removed in time and in substance from the events at issue here to support a Title VI claim. The United States provided military support to Kuwait decades before Iris Nektalov sought to board a KAC airplane, and there is simply no cognizable nexus between this country's military assistance to the nation of Kuwait and KAC's operation of a civilian commercial airline. There is nothing in the record to suggest that the government of Kuwait – let alone KAC – was ever in a position to accept or reject the statutory prohibition of discrimination under Title VI as the price of this country's military support in the 1991 Gulf War, or that KAC was in any meaningful sense the intended recipient of such assistance.

13

Further, the Complaint does not allege, and the Nektalovs do not argue, that this country's past or present military support of Kuwait is of a contractual nature that implicates Title VI. Finally, the Nektalovs do not cite, and I have not found, any precedent for the proposition that federal military assistance to a foreign nation can render that entire nation, and all of its corporate subsidiaries, subject to the constraints of Title VI.[6]

The Nektalovs' second argument – that KAC is a recipient of federal financial assistance because it "regularly lands at" JFK Airport, which receives federal financial assistance – fails for a different reason. KAC is not a recipient of such funding at all. Rather, like the competing airlines and many other businesses that operate at JFK, it is a beneficiary of the funding the federal government provides to the Port Authority of New York and New Jersey to operate the airport. The Supreme Court made that distinction clear in *Paralyzed Veterans of Am.*, 477 U.S. at 607 ("[T]he airlines do not actually receive the aid; they only benefit from the airports' use of the aid.").[7]

Finally, because the Nektalovs do not allege that they were the intended beneficiaries of either the military assistance to Kuwait or the financial assistance to JFK airport, they have not established standing to assert a claim under Title VI. *See Bary v. Delta Airlines, Inc.*, 2009 WL 3260499, at *7, n.7 (E.D.N.Y. Oct. 9, 2009), *aff'd*, 553 F. App'x 51 (2d Cir. 2014) ("'In order to establish

---

[6] The foregoing analysis is entirely consistent with the reasoning in the one judicial decision the Nektalovs cite in support of their Title VI claim. *See* NO at 7 (citing *Bossier Parish Sch. Bd. v. Lemon*, 370 F.2d 847 (5th Cir. 1967)). *Lemon* involved a claim that a local school board that had received federal education funds discriminated against the African-American children living on a military base within the district; the court made the (now) unremarkable holding that such discrimination was in violation of Title VI and rejected the school board's "bizarre excuse" that the excluded students were "federal children" who, as residents of a military installation, were not within the jurisdiction of a state and therefore not protected by the Fourteenth Amendment. 370 F.2d at 849-50. The case is thus entirely inapposite to the instant lawsuit.

[7] The statute at issue in the cited case was the nondiscrimination provision of Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794. That statute was modeled on the corresponding provision in Title VI, and is interpreted in the same way. *See Paralyzed Veterans of Am.*, 477 U.S. at 600 & n.4 (1986).

standing to sue under [Title VI] plaintiffs must be the intended beneficiaries of the federal spending program.'" (quoting *Scelsa v. City Univ. of New York*, 806 F. Supp. 1126, 1140 (S.D.N.Y. 1992); citing *Coal. of Bedford-Stuyvesant Block Ass'n, Inc. v. Cuomo*, 651 F. Supp. 1202, 1208 n.2 (E.D.N.Y. 1987))).

The defects in the Complaint and in the Nektalovs' arguments opposing dismissal are not amenable to being cured in an amended pleading. I therefore dismiss with prejudice Count 2 of the Complaint for failure to state a claim.

C.     Count 3: IIED

In seeking to dismiss the Nektalovs' IIED claim, KAC argues that its admitted discrimination against Iris Nektalov on the basis of her Israeli citizenship is not "extreme and outrageous conduct" but was instead merely "distasteful." KM at 7. Characterizing such intentional discrimination as merely "distasteful" is nothing short of astonishing – and KAC, when pressed at oral argument, reluctantly acknowledged that it was unable to explain why there was *not* something "shocking or outrageous about bigotry against people of one country." Tr. at 35. Notwithstanding that concession, however, KAC persists in arguing that its act of intentional discrimination in this case does not satisfy the strict standard for an IIED claim under New York law – and I am constrained by precedent to agree.

An IIED claim under New York law has four essential elements: "(1) extreme and outrageous conduct, (2) intent to cause severe emotional distress, (3) a causal connection between the conduct and the injury, and (4) severe emotional distress." *Bender v. City of New York*, 78 F.3d 787, 790 (2d Cir. 1996) (citing *Howell v. New York Post Co.*, 81 N.Y.2d 115, 121 (1993)). A plaintiff opposing a motion to dismiss such a claim must meet an "extremely high" standard. *Downing v. Am. Airlines, Inc.*, 1988 WL 49211, at *3 (E.D.N.Y. May 9, 1988) (citing *Murphy v. Am. Home Prods. Corp.*, 447 N.Y.S.2d 218, 219-20 (Sup. Ct.), *aff'd*, 451 N.Y.S.2d 770 (App. Div. 1982), *aff'd*, 58 N.Y.2d 293

15

(1983)); *see also Robles v. Cox & Co.*, 841 F. Supp. 2d 615, 631 (E.D.N.Y. 2012) ("[T]he standard for

stating a valid claim of [IIED] is rigorous, and difficult to satisfy") (internal quotation marks and

citations omitted). New York courts require that "the conduct be 'so outrageous in character, and so

extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious,

and utterly intolerable in a civilized society.'" *Martin v. Citibank, N.A.*, 762 F.2d 212, 220 (2d Cir.

1985) (citing *Fischer v. Maloney*, 43 N.Y.2d 553, 557 (1978) (quoting Restatement (2d) Torts § 46(1))).

"[S]atisfying the 'outrageousness' element is difficult, even at the pleadings stage." *Russo-Lubrano v.

Brooklyn Fed. Sav. Bank*, 2007 WL 121431, at *6 (E.D.N.Y. Jan. 12, 2007) (internal quotation marks

and citations omitted). "In fact, none of the IIED claims considered by the New York Court of

Appeals have survived because the conduct was not sufficiently outrageous." *Elmowitz v. Exec. Towers

at Lido, LLC*, 571 F. Supp. 2d 370, 378 (E.D.N.Y. 2008) (citing *Howell*, 81 N.Y.2d at 122); *see also

Russo-Lubrano*, 2007 WL 121431, at *7 & n.18 (surveying case law and finding that the only two

federal decisions allowing IIED claims not based on inappropriate sexual conduct to proceed both

involved defendants who allegedly engaged in repeated and long-term harassment of the plaintiffs –

and finding that even those cases had been criticized as unpersuasive) (citing *Polley v. Fed. Reserve Bank

of New York*, 1994 WL 465923, at *1 (S.D.N.Y. 1994); *Zaffino v. Surles*, 1995 WL 146207, at *5 (S.D.N.Y.

1995)).

   Outside of the employment context (as this case is), "New York courts appear to require

that plaintiffs allege either an unrelenting campaign of day in, day out harassment or that the

harassment was accompanied by physical threats, in order to state a cognizable claim for [IIED]."

*Ticali v. Roman Catholic Diocese of Brooklyn*, 41 F. Supp. 2d 249, 266 (E.D.N.Y. 1999), *aff'd*, 201 F.3d

432 (2d Cir. 1999) (quoting *Nunez v. A-T Fin. Info. Inc.*, 957 F. Supp. 438, 442 (S.D.N.Y. 1997)

(internal quotation marks omitted); *see also King v. City of New York*, 2013 WL 2285197, at *11

(E.D.N.Y. May 23, 2013) (an IIED claim "must generally be premised upon a breach of a duty owed directly to the plaintiff which either endangered the plaintiff's physical safety or caused the plaintiff fear for his or her own physical safety" (quoting *Jason v. Krey*, 875 N.Y.S.2d 194, 195 (App. Div. 2009))). "To survive a motion to dismiss, [t]he conduct alleged must be such that it can be fairly characterized as egregious, utterly despicable, heartless or flagrant. Acts which merely constitute harassment, disrespectful or disparate treatment, a hostile environment, humiliating criticism, intimidation, insults or other indignities … [are] not sufficiently outrageous." *Russo-Lubrano*, 2007 WL 121431, at *6 (citing *Lydeatte v. Bronx Overall Econ. Dev. Corp.*, 2001 WL 180055, at *2 (S.D.N.Y. Feb. 22, 2001)) (internal quotation marks omitted) (alterations in original).

Courts in this circuit have even found that discrimination on the basis of race or national origin does not easily rise to the level of "extreme and outrageous" conduct. *See Martin*, 762 F.2d at 220 (finding that the plaintiff's allegations that her employer polygraphed her regarding a theft solely because of her race, even if fully established, did not support a finding of IIED "despite the unacceptability of racial discrimination in civilized society"); *Benjamin v. N.Y.C. Dep't of Health*, 2002 WL 485731, at *9 (S.D.N.Y. Mar. 29, 2002), *aff'd in part*, 144 F. App'x 140 (2d Cir. 2005) (dismissing plaintiff's IIED claim despite allegations of a pattern of "disparate treatment, humiliation and insults" based on her national origin); *Lydeatte*, 2001 WL 180055, at *2 (alleged race-based employment discrimination and harassment, "even if done maliciously, simply fails to measure up to what is require to establish [an IIED] claim."); *see also Leibowitz v. Bank Leumi Tr. Co. of New York*, 548 N.Y.S.2d 513, 521 (App. Div. 1989) (dismissing the Jewish plaintiff's IIED claims based, in part, on the use of ethnic and racial slurs against her, notwithstanding the court's acknowledgement that the alleged conduct was "deplorable and reprehensible").

17

In opposing dismissal of their IIED claim, the Nektalovs cite no authority for the proposition that the conduct they allege is sufficiently extreme and outrageous for purposes of New York law. Indeed, they do not respond to this prong of KAC's argument at all, limiting their argument instead only to the question of supplemental jurisdiction over the claim. *See* NO at 7-9. In light of the extensive precedent cited above, and in the absence of any countervailing authority, I am constrained to conclude that New York law would not consider KAC's deliberate discrimination against Iris Nektalov to be sufficiently extreme and outrageous as to support an IIED claim.

Moreover, even if the Nektalovs could establish that KAC's conduct was "extreme and outrageous," their IIED claim would be barred for the independent reason that New York courts "do not allow IIED claims where 'the conduct complained of falls well within the ambit of other traditional tort liability.'" *McGrath v. Nassau Health Care Corp.*, 217 F. Supp. 2d 319, 335 (E.D.N.Y. 2002) (quoting *Lian v. Sedgwick James of New York, Inc.*, 992 F. Supp. 644, 651 (S.D.N.Y. 1998)). "IIED claims that are duplicative of other tort claims should therefore be dismissed." *Id.* (citing *Lian*, 992 F. Supp. at 651). Thus, where the "offending conduct is embraced by another tort remedy, including … under the Human Rights Law[,]" IIED is not available as a theory of recovery. *See Audrey v. Career Inst. of Health & Tech.*, 2014 WL 2048310, at *3 (E.D.N.Y. May 18, 2014). Because the Nektalovs have a viable claim under the NYSHRL and NYCHRL, they may not concurrently assert an IIED claim. I therefore dismiss Count 3 of the Complaint with prejudice for failure to state a claim.

      D.    <u>Counts 4-6: Negligence Claims</u>

The Nektalovs assert three causes of action based on a theory of negligence: negligent infliction of emotional distress; negligence; and failure to train, supervise and discipline. As explained below, I agree with KAC that all of those claims must be dismissed with prejudice, albeit for reasons

other than those KAC advances. Briefly stated, the negligence-based claims cannot proceed because they are refuted by the Complaint's substantive factual allegations that KAC's conduct was intentional rather than negligent.

The plaintiffs allege that the airline engaged in deliberate discrimination. *See* Complaint ¶ 5 (explaining that KAC has a policy against transporting passengers with Israeli passports); *id.* ¶ 18 ("Defendant's actions were intentional, malicious, willful, wanton, and callous."); *id.* ¶ 24 ("KAC engaged in intentional discrimination"); *see also* NR at 3 (arguing that it makes no sense for KAC to argue "that it did not intend to commit the wrongful act" because it had "earlier argued that it was merely enforcing its own law").[8]  The Nektalovs therefore contradict themselves in making the conclusory assertion, for purposes of their negligence claims, that "KAC acted negligently and/or recklessly when [it] refused to allow [Iris Nektalov] to board its airplane[.]" Complaint ¶ 41. Under these circumstances, I must disregard the Nektalovs' implausible assertions of negligence and dismiss with prejudice Counts 4 through 6 of their Complaint. *See Frederique v. Cty. of Nassau*, 2016 WL 1057008, at *17 (E.D.N.Y. Mar. 11, 2016) ("[U]nder New York law, harm predicated on an intentional act may not give rise to a claim of negligence." (quoting *Bah v. City of New York*, 2014 WL 1760063, at *13 (S.D.N.Y. May 1, 2014))); *Schetzen v. Robotsis*, 709 N.Y.S.2d 193, 194 (App. Div. 2000) ("[I]f, based on a reading of the factual allegations, the essence of the cause of action is, as here, assault [an intentional tort], the plaintiffs cannot exalt form over substance by labeling the action as one to recover damages for negligence" (citations omitted)); *see also United Nat'l Ins. Co. v. Tunnel, Inc.*, 988 F.2d 351, 353 (2d Cir. 1993) (recognizing the "mutual exclusivity" of intentional torts – specifically battery – and negligence).

---

[8]  Indeed, although KAC disagrees with the proposition that its actions can be characterized as intentional discrimination, *see* KO at 4, it clearly agrees that the conduct at issue in this case was purely deliberate. *See, e.g.*, KM at 1 (acknowledging that it denied passage to Iris Nektalov "because she was traveling under an Israeli passport").

E.     Counts 8-9: The U.N. Charter and Federal Anti-Boycott Regulations

KAC correctly observes that neither the United Nations Charter nor the federal anti-boycott rule on which the Nektalovs rely creates a private right of action. *See Mora v. New York*, 524 F.3d 183, 201-02 (2d Cir. 2008) (citing *U.S. ex rel. Lujan v. Gengler*, 510 F.2d 62, 67 (2d Cir. 1975)) (no private right of action under U.N. Charter); *Bey v. New York*, 2012 WL 4370272, at *7 (E.D.N.Y. Sept. 21, 2012) (same); *Bulk Oil (ZUG) A.G. v. Sun Co., Inc.*, 583 F. Supp. 1134, 1143 (S.D.N.Y. 1983), *aff'd*, 742 F.2d 1431 (2d Cir. 1984) (finding no private right of action under the Export Administration Act[9] and therefore granting defendants' motion to dismiss the plaintiff's claim under the Act). The Nektalovs cite no authority to the contrary. *See* NO at 9-13. I therefore dismiss with prejudice Counts 8 and 9 of the Complaint.

IV.    Conclusion

For the reasons set forth above, I deny the plaintiffs' motion for partial summary judgment; I dismiss without prejudice their claim under Title 42, United States Code, Section 1981; and I dismiss with prejudice all of their remaining claims (other than the claim of discrimination under state and municipal law, which the defendants have not challenged). The plaintiffs may file an amended complaint no later than October 31, 2016.

SO ORDERED.

Dated:  Brooklyn, New York
        September 30, 2016

                                              _____/s/_____
                                              JAMES ORENSTEIN
                                              U.S. Magistrate Judge

---

[9]  The Export Administration Regulations, with their anti-discrimination provisions, are "promulgated pursuant to the Export Administration Act, 50 U.S.C. App. §§ 2401–2420[.]" *United States v. Geissler*, 731 F. Supp. 93, 93 (E.D.N.Y. 1990).